NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KELLY CHESLER and JOSEPH ASCOLESE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF JERSEY CITY, JAMES SHEA in his individual and official capacities, PHILIP ZACCHE in his individual and official capacities, JOSEPH CONNORS in his individual and official capacities, JOHN PETERS in his individual and official capacities, TERRENCE CROWLEY in his individual and official capacities, and ROBERT SJOSWARD in his individual and official capacities,<br><br>Defendants, | Case No: 15-1825 (SDW) (ESK)<br><br><br>**OPINION**<br><br><br>September 29, 2020 |

**WIGENTON,** District Judge.

Before this Court are Defendants James Shea ("Shea"), Philip Zacche ("Zacche"), Joseph Connors ("Connors"), John Peters ("Peters"), Terrence Crowley ("Crowley"), Robert Sjosward ("Sjosward," collectively, "Individual Defendants"), and City of Jersey City's ("Jersey City," with the Individual Defendants, "Defendants") Motion to Dismiss Plaintiffs Kelly Chesler ("Chesler") and Joseph Ascolese's ("Ascolese," collectively, "Plaintiffs") Second Amended Complaint.  (D.E. 113.)  Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Venue is proper pursuant to 28 U.S.C. § 1391(b).  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated below, Defendants' motion is **DENIED**.

### I.    BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiff Chesler is a police officer for the Jersey City Police Department ("JCPD"), and Plaintiff Ascolese is a former JCPD officer.  (D.E. 113 ¶¶ 6-7.)  Defendant Jersey City is an

---

[1] For the limited purposes of this Opinion, this Court assumes the facts alleged in the Complaint are true.

incorporated municipality in Hudson County, New Jersey; Shea is Jersey City's Director of Public Safety; Zacche was Jersey City's Acting Chief of Police, and later Chief of Police from July 2014 to 2017; Connors was Jersey City's Deputy Chief of Police and at times Zacche's Chief of Staff from October 2013 to 2018; and Crowley, Peters, and Sjosward were JCPD officers, with Sjosward additionally part of JCPD's Internal Affairs Unit ("IA"). (*Id.* ¶¶ 8-14, 35.)

In July 2013, Steven Fulop ("Fulop") became mayor of Jersey City, and Robert "Bubba" Cowan ("Cowan") was named Chief of the JCPD patrol division. (*Id.* ¶¶ 21-22.) In the following months, Plaintiffs developed a Special Operations unit for the JCPD ("Special Operations"), for which Chesler was Executive Officer and Ascolese, a commander. (*Id.* ¶¶ 23-27, 72.)

During this time, Peters began harassing Chesler based on her gender, for example, stating Chesler was "going down" and that he would "get her" due to her gender, asking other officers if they had sex with Chesler, and falsely accusing her of misconduct. (*Id.* ¶ 28.) Plaintiffs complained to their superiors and to IA about Peters' conduct several times from March to July 2014, and multiple times after. (*Id.* ¶¶ 30, 60, 62, 75, 77, 79.)

On July 25, 2014, Zacche replaced Cowan as Chief. (*Id.* ¶ 78.) Days later, on July 30, Plaintiffs met with Connors, Sjosward, Deputy Chief Joseph Delaney ("Delaney"), Cowan, Zacche, and another IA officer, to discuss Peters' harassment ("July Meeting"). (*Id.* ¶¶ 35, 80.) During this meeting, Sjosward informed Chesler that they have not investigated because she needed to make a complaint to the Equal Employment Opportunity Commission ("EEOC") first, advice which was contrary to the JCPD's antidiscrimination policy. (*Id.* ¶ 36.) No one investigated or acted against Peters after any of Plaintiffs' complaints or this meeting. (*Id.* ¶¶ 32, 37.)

Around July and August 2014, Cowan criticized Fulop, and Ascolese supported these criticisms. (*Id.* ¶¶ 81-82.) Ascolese was known to be a "supporter of Cowan" and so was

2

"considered to oppose Mayor Fulop." (*Id.*)  On September 3, 2014, Connors instructed Ascolese not to oppose Fulop or discuss Cowan's opposition of Fulop, or it "could be bad for you." (*Id.* ¶ 83.)  Later that month, Zacche told Chesler that she had the "Bubba stink," referring to her association with Cowan and his lack of support for Fulop. (*Id.* ¶ 40.)

On September 14, 2014, Timothy Crowley, a former officer and Crowley's brother, called Chesler and Ascolese, individually, asking for a donation for the Hudson County Democratic Organization ("HCDO"), to which both declined, stating their political neutrality. (*Id.* ¶¶ 39, 84.)

On October 2, 2014, IA investigated Chesler's arrangement of a police escort for the Don Bosco High School football team, which had been approved of, and complied with proper practice ("Don Bosco Investigation"). (*Id.* ¶ 41.)  On November 12 and 13, 2014, Shea effectively demoted both Plaintiffs from their Special Operations positions. (*Id.* ¶¶ 46, 85.)[2]

Around this time, Plaintiffs received a report which stated Crowley had made racially and sexually disparaging remarks on a 2010 police report ("2010 Crowley Report"), which they forwarded to their superiors, including Zacche. (*Id.* ¶¶ 88-89.)  On November 24, 2014, Ascolese learned from JCPD Officer Anthony Ruocco ("Ruocco") that Crowley pressured him to create false reports suggesting Ascolese committed misconduct, which Ascolese also reported to Zacche on December 5, 2014. (*Id*. ¶¶ 90, 93.)  Zacche was reportedly "pissed off" that Ascolese complained about Crowley. (*Id*. ¶ 94.)[3]  Also around this time, Connors pressured Ascolese into resigning, stating if Ascolese did not, he would baselessly charge, discipline, or terminate Ascolese. (*Id.* ¶ 97.)  Ascolese retired on January 29, 2015. (*Id.* ¶¶ 98-99.)

On February 4, 2015, Chesler was informed that Peters stated he would do "everything I can to destroy" Plaintiffs for reporting him, and that he had filed a complaint against her with the

---

[2] On January 22, 2015, Shea further transferred Plaintiffs to less desirable positions on patrol. (*Id.* ¶¶ 50, 95.)
[3] On March 16, 2015, Chesler reported Crowley to IA for further misconduct. (D.E. 113 ¶¶ 55-56.)

Hudson County Prosecutor's Office ("HCPO"). (*Id.* ¶¶ 58-59.) This complaint accused Plaintiffs of approving improper payments for an ongoing detail related to anticipated traffic issues resulting from a closure of Pulaski Skyway. (*Id.* ¶ 101.) Peters, who originally contacted the HCPO in December 2014, knew this would lead to an IA investigation led by Sjosward, Zacche, and Shea, and believed that they would find wrongdoing because they "had a history of misusing IA investigations to retaliate against officers." (*Id.* ¶¶ 101-03.)[4]

The HCPO enlisted IA to help investigate ("Pulaski Investigation"), using Sjosward as its primary conduit for information. (*Id.* ¶ 105.) In this role, Sjosward, between December 2014 and October 2018, withheld evidence and provided misleading information to the HCPO with the assistance and encouragement of Zacche and Shea. (*Id.* ¶ 106.) This included producing evidence that Defendants "knew to be false and/or misleading," such as documents showing that Plaintiffs improperly signed off on pay vouchers, and a "false narrative" that Plaintiffs did not follow procedures verifying officers were present at their posts, among other things. (*Id.* ¶¶ 107-11.) Zacche additionally ordered Ruocco to give a false statement to the HCPO against Plaintiffs, when Defendants knew he had indicated he had no knowledge of such claims. (*Id.* ¶¶ 112-13.)

On May 10, 2016, Sjosward testified before a Hudson County grand jury, during which he "repeatedly provided knowingly false and/or misleading testimony" against Plaintiffs, including failing to advise the grand jury of the falsity of Ruocco's statement. (*Id.* ¶¶ 113-16.) The grand jury returned a 107-count indictment against Plaintiffs on June 14, 2016. (*Id.* ¶ 117.)

The same day, Chesler was suspended without pay and, as a result of the indictment, Ascolese's pension payments were stopped. (*Id.* ¶¶ 119-20.) On July 7, 2016, Chesler was suspended indefinitely, pending the outcome of the criminal case. (*Id.* ¶¶ 121-123.) Over the next

---

[4] On February 5 and 11, 2015, Chesler made two more complaints of sexual harassment to IA. (D.E. 113 ¶¶ 60, 62.) Subsequently, Shea instructed IA to "find dirt" on Chesler. (*Id.* ¶ 63.)

two years, Chesler was passed over for promotion three times. (*Id.* ¶¶ 125-27.) Plaintiffs' trial began on September 5, 2018, however, on October 23, 2018, prior to the end of trial, the HCPO dismissed all criminal charges. (*Id.* ¶¶ 128-29.)

Plaintiffs filed this action on March 11, 2015. (D.E. 1.) On June 27, 2016, this Court administratively terminated this action, pending the resolution of the criminal action against Plaintiffs, and reopened the case on February 22, 2019. (D.E. 37, 41.) Plaintiffs subsequently amended their complaint on December 4, 2019. (D.E. 73.) Plaintiffs were granted further leave to amend, filing the operative Second Amended Complaint ("SAC") on May 19, 2020. (D.E. 113.) Defendants filed the instant motion to dismiss on June 2, 2020 (D.E. 116), and the parties timely briefed the motion. (D.E. 123, 127.)

## II. LEGAL STANDARD

A defendant may move to dismiss a complaint for failing to state a claim under Rule 12(b)(6). An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

In considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

### III. DISCUSSION

Defendants move to dismiss (1) Counts 1 and 2, under 42 U.S.C. § 1983 ("Section 1983"), for First and Fourteenth Amendment violations against Jersey City and the Individual Defendants, minus Sjosward; (2) Count 5 for violations of the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, *et seq.* ("NJCRA") against all Defendants; and (3) several counts against Sjosward, specifically (a) Count 3 for violations of the Conscientious Employee Protection Act, N.J. Stat. Ann. § 34:19, *et seq.* ("CEPA"); (b) Count 7 for retaliation in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5, *et seq.* ("NJLAD"); and (c) Count 4 for conspiracy.

    A. **Counts 1 and 2: 42 U.S.C. § 1983, First and Fourteenth Amendment Violations against Jersey City and Individual Defendants**

Section 1983 prohibits persons, "under color of any statute, ordinance, regulation, custom, or usage," to deprive another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not create substantive rights, but "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneip v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). "As a general matter, there is no vicarious liability under Section 1983." *Borntrager v. Zisa*, Civ, No. 09-3076, 2011 WL 1211349, at *2 (D.N.J. Mar. 29, 2011). Defendants must have "personally participated in the alleged wrong" to be liable. *Id.*

Plaintiffs bring Section 1983 claims, alleging Defendants, except Sjosward, violated their First and Fourteenth Amendment rights under the United States Constitution. Namely, Plaintiffs allege that Defendants retaliated against them for their political neutrality and lack of support for Fulop, in violation of their rights of (1) freedom of association and (2) freedom of speech. Plaintiffs further argue (3) Jersey City had policies and/or customs allowing such violations.

### i. Freedom of Association

The "freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56-57 (1973). To make a *prima facie* case of discrimination based on political patronage, plaintiff "must show that (1) she was employed at a public agency in a position that does not require political affiliation, (2) she was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007). At issue is whether Plaintiffs sufficiently plead the second element. (*See* D.E. 116-1 at 17.)

Plaintiffs assert that their political neutrality and lack of support for the HCDO or Fulop is constitutionally protected. (*See* D.E. 113 ¶¶ 136-144; D.E. 123 at 24.) As alleged, both declined to donate to the HCDO, while affirmatively stating their political neutrality. (D.E. 113 ¶¶ 39, 84.) Additionally, they plead that Connors threatened Ascolese to "not oppose Mayor Fulop." (*Id*. ¶ 83.)[5] These allegations lead to the reasonable inference that Plaintiffs expressed their political

---

[5] Plaintiffs also allege that Defendants imputed "Cowan's lack of support for Mayor Fulop" onto Chesler, which, though it could be clearer, adds at least some support that Chesler expressed, or was perceived to express, a lack of support for Fulop. (D.E. 113 ¶ 40.) *See Heffernan v. City of Paterson, N.J*., 136 S. Ct. 1412, 1418 (2016) (finding retaliation based on mistaken perception employee engaged in protected "political activity" is actionable); *see also Owens v. Sadsbury Twp*., Civ. No. 07-742, 2008 WL 4441990, at *5-6 (E.D. Pa. Sept. 30, 2008) (denying defendants' summary judgment motion on plaintiff's claim "that he was fired for his perceived lack of political support for" defendants because his "lack of political involvement [did] not disqualify him from protection from being fired for failing to support [defendants'] politics").

neutrality and lack of support for Fulop or the HCDO, both protected conduct. *See Galli*, 490 F.3d at 273 (finding failure to support a political campaign or party constitutionally protected).[6]

Defendants also argue that Plaintiffs fail to sufficiently plead that Defendants were "aware of [Plaintiffs'] allegiances," challenging whether Plaintiffs plead the third element. (D.E. 116-1 at 20.) Plaintiffs' allegations are sufficient. They allege Defendants perceived them to not support Fulop, including through Connors' alleged threat to Ascolese to not oppose Fulop, and that both Plaintiffs notified Defendant Crowley's brother, himself a former officer, when declining to donate to the HCDO. (D.E. 113 ¶¶ 39-40, 82-84.) Viewed in the light most favorable to Plaintiffs, their allegations give rise to an inference that Defendants knew Plaintiffs' allegiances.[7]

      ii. Freedom of Speech

"A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-42 (3d Cir. 2006) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). At issue is whether Plaintiffs plead the second element, a protected statement which involved a matter of public concern.[8]

---

[6] Defendants analogize this case to *Goldrich v. City of Jersey City*, which was before this Court. Civ. No. 15-885, 2017 WL 6209205 (D.N.J. Dec. 8, 2017). *Goldrich* is distinguishable. First, *Goldrich* was decided at summary judgment, with the benefit of discovery. Second, this Court in *Goldrich* found that plaintiff's affiliation with Cowan himself was not a cognizable political affiliation. *Id*. at *4. Here, viewing the SAC in the light most favorable to Plaintiffs, while Plaintiffs expressed support for Cowan, they also expressed their political neutrality, and their allegations support a reasonable inference that they did not support, or previously support, Fulop. (*See* D.E. 113 ¶¶ 40, 82.) Defendants further argue that Plaintiffs' single acts of neutrality are insufficient to plead constitutionally protected activity, but provide no law directly supporting this assertion at the pleading stage. (D.E. 116-1 at 18-19.)
[7] Defendants do not appear to otherwise challenge this element.
[8] The parties argue the first element, however, do not appear to disagree. Neither party contests (and this Court agrees) that Plaintiffs spoke as citizens when making politically related speech, but spoke as part of their official duties (and thus, not as citizens) when making speech related to workplace misconduct. *See Falco v. Zimmer*, 767 F. App'x 288, 305 (3d Cir. 2019) (noting "supporting political candidates is presumably outside the ordinary job duties of [Police] officers"); *Morris v. Philadelphia Hous. Auth*., 487 F. App'x 37, 39 (3d Cir. 2012) (finding complaints "related to an

"An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community,'" as "determined by its 'content, form, and context.'" *Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir. 1993) (quoting *Connick v. Myers*, 461 U.S. 138, 146-48 (1983)).[9]

Plaintiffs sufficiently pled speech when they allegedly stated their political neutrality and "supported" criticisms of Fulop. (D.E. 113 ¶¶ 39-40, 82-84.) In turn, given the speech's political nature and the context in which it was made, Plaintiffs adequately plead it was of public concern. Namely, Plaintiffs stated their political neutrality in order to affirmatively refuse to support a political entity, the HCDO, while the criticisms against Fulop were in the context of his role as mayor. (*Id.*)[10] Giving Plaintiffs all favorable inferences, this Court finds they adequately plead political speech of public concern.

      iii.  Jersey City Policy and Custom

When suing a municipality under Section 1983, a plaintiff must additionally show "(1) an unconstitutional policy or custom (2) attributable to the municipality (3) caused an official to inflict a constitutional injury upon the plaintiff." *Mahmoud v. City of Paterson*, 611 F. App'x 95, 98 (3d Cir. 2015) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 663 (1978)).

---

employee's workplace duties—for example . . . misconduct by other employees—are within an employee's official duties"). Defendants only contest this element in that they argue Plaintiffs have not pled any political "speech" at all.
[9] If it finds a public employee's speech a matter of public concern, the court "must then determine whether the interest of the state in promoting the efficiency of the public services it performs through its employees outweighs the interest of the employee in commenting upon matters of public concern." *Holder*, 987 F.2d at 195. This is not at issue here.
[10] The support of a political candidate is "squarely within the[] parameters" of being a matter of public concern. *Falco*, 767 F. App'x at 305. By extension, Plaintiffs' speech, at this stage and in this context, affirmatively declining to support, or criticizing, a political entity is as well. While Plaintiffs, particularly Chesler, could have pled their speech supporting criticisms of Fulop more clearly, giving Plaintiffs all favorable inferences, they sufficiently plead such speech. Notably, the alleged perception that Plaintiffs were anti-Fulop tends to bolster their allegations. *See Heffernan*, 136 S. Ct. at 1418 (finding where "employer mistakenly thought that the employee *had* engaged in protected speech," or other "political activity that the First Amendment protects," and demoted him in retaliation, the "employee is entitled to challenge that unlawful action" (emphasis in original)).

9

Primarily at issue is the first element.  (*See* D.E. 116-1 at 24.)  "A policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict.  A custom is an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law."  *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (internal citations and quotation marks omitted, alteration in original).

Plaintiffs allege that the heads of IA, Zacche and Shea, who were also Police Chief and Director of Public Safety, respectively, "had a history of misusing IA investigations to retaliate against officers."  (D.E. 113 ¶¶ 9-10, 103.)  Plaintiffs then detail how IA, including Zacche and Shea, allegedly used investigations to retaliate against them, for example, by initiating the Don Bosco Investigation, allegedly providing false information for the Pulaski Investigation, and instructing IA to "find dirt" on Chesler.  (*See, e.g.*, D.E. 113 ¶¶ 41-44, 63, 85, 105-06.)  These allegedly led to Plaintiffs' demotions, Chesler's suspension, and Ascolese's resignation.  (*See id.* ¶¶ 46, 50, 95-99, 119-20.)  At this stage, Plaintiffs' allegations are sufficient.  *See Davis v. City of Philadelphia*, Civ. No. 05-4571, 2009 WL 2461777, at *4 (E.D. Pa. Aug. 11, 2009) (finding custom pled where plaintiff "identified a specific custom of [officers and internal affairs] retaliating against officers who speak out against the harassment of other officers").[11]

### B.  **Count 5: The New Jersey Civil Rights Act**

The NJCRA gives a cause of action to "[a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the

---

[11] The *Davis* Court ultimately found that plaintiff failed to state a claim because he failed to connect the custom to a policymaker with "final, unreviewable authority."  *See Davis*, 2009 WL 2461777 at *4 (only identifying a "captain, lieutenant, sergeant, inspector or deputy").  Giving Plaintiffs all reasonable inferences, this is not the case here, where Zacche and Shea, the Chief of Police and Director of Public Safety, were the alleged policymakers.  (*See* D.E. 113 ¶¶ 9-10, 103.)  *See also Davis*, 2009 WL 2461777 at *4 (noting the Police Commissioner could be such policymaker).

10

Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State." N.J. Stat. Ann. § 10:6-2. New Jersey courts have interpreted the NJCRA analogously to Section 1983. *See Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 443 (D.N.J. 2011). Thus, for the same reasons Plaintiffs' Section 1983 claims survive, their NJCRA claims survive.

### C. **Counts 3, 4 and 7 Against Sjosward**

Defendants move to dismiss the following claims against Sjosward, only: (1) Count 3, for violations of CEPA; (2) Count 7, for violations of NJLAD; and (3) Count 4, for conspiracy.

#### i. Count 3: Retaliation Under CEPA

"To establish a CEPA violation, a plaintiff must prove that: (1) she reasonably believed her employer was violating a law or rule; (2) she performed a protected whistleblowing activity; (3) an adverse employment action was taken against her; and (4) there is a causal connection between the whistleblowing activity and the adverse action." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 240 (3d Cir. 2016).[12] CEPA is to "be construed liberally in employees' favor." *Id*. Plaintiffs assert that Defendants violated CEPA by retaliating against them for making complaints of sexual harassment and for reporting Crowley's alleged misconduct. Defendants argue Plaintiffs have not plausibly alleged the third and fourth elements as to Sjosward.

##### 1. Adverse Employment Action

Under CEPA, retaliation is the "discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). Other adverse employment actions may include

---

[12] CEPA, in relevant part, states that "[a]n employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes . . . is in violation of a law." N.J. Stat. Ann. § 34:19-3(a).

11

altering "salaries, hours, and fringe benefits; physical arrangements and facilities; and promotional procedures." *Beasley v. Passaic Cty.*, 873 A.2d 673, 685-86 (N.J. App. Div. 2005) (internal citations omitted).

Primarily at issue is whether, as alleged, Sjosward violated CEPA through his role in the Pulaski Investigation. Defendants argue that he did not because investigations, "if conducted properly," are "not normally considered retaliation." *Id.* at 684-85. A "strong showing" that an investigation was illegitimate, however, may allow "an affirmative CEPA claim." *Id.* at 685.

Plaintiffs plausibly allege that the Pulaski Investigation, as conducted by Sjosward, was an adverse employment action. Initially, Plaintiffs plead that Sjosward was significantly involved, acting as the "primary conduit" between IA and the HCPO. (D.E. 113 ¶ 105; *see also id.* ¶¶ 102-03.) They further detail how, from December 2014 to October 2018, Sjosward allegedly provided the HCPO false or manipulated documents, withheld evidence, and provided false testimony to the ensuing grand jury. (*See id.* ¶¶ 106-16.) Viewed in the light most favorable to Plaintiffs, their allegations lead to a reasonable inference that Sjosward facilitated an illegitimate investigation that amounted to an adverse employment action.[13]

### 2. Causation

Causation in CEPA claims is determined: "(1) by draw[ing] an inference from all of the circumstances relating to the decision, (2) by evaluat[ing] the response of the employee's supervisor to the complaint, including looking at whether the employer ratified or ignored the complaint, and (3) by looking for an indirect causal link such as a supervisor who might have sufficiently tainted the views of the actual decision maker to support relief." *Peters v. Silverton Volunteer Fire Co. No. 1*, Civ. No. 3498-14T1, 2016 WL 6518595, at *4 (N.J. Super. Ct. App.

---

[13] The Pulaski Investigation led to clearly adverse employment consequences for Plaintiffs, including indictment, suspension without pay, suspension of pension benefits, and denials of promotion. (D.E. 113 ¶¶ 119-20, 122-27.)

Div. Nov. 3, 2016) (quotation marks omitted). Additionally, while plaintiffs often point to close "temporal proximity" or "timing and ongoing antagonism" as the basis for a causal link between protected activity and alleged retaliatory action, they may also "substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

Plaintiffs plausibly plead a causal connection between Sjosward's alleged retaliation and their complaints against Peters and Crowley. Plaintiffs allege they began complaining to IA of Peters' harassment in March 2014, leading to the July Meeting, which Sjosward attended. (*See, e.g.*, D.E. 113 ¶¶ 30-31, 36, 60, 62, 75, 77.) Sjosward's allegedly retaliatory conduct began in December 2014, when he purportedly began feeding the HCPO false or misleading information for the Pulaski Investigation. (*See id.* ¶¶ 101-102, 105-11, 113-16.) Thus, Sjosward's conduct began around five months after the July Meeting.[14]

Notably, Defendants never investigated or acted on Plaintiffs' complaints, which Plaintiffs continued to make after the July Meeting. (*Id.* ¶¶ 32, 37, 49, 60-62, 88-89.) Additionally, at the July Meeting, Sjosward allegedly said IA was not investigating because Chesler needed to first "make an EEOC complaint," but this advice was contrary to JCPD's anti-discrimination policy. (*Id.* ¶ 36.) Taken as true and in the light most favorable to Plaintiffs, Defendants' non-action and Sjosward's misdirection support Plaintiffs' causation theory. *See Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 626 (N.J. 2013) (finding "where the response to an allegation of [unlawful] behavior was to . . . ignore the complaint rather than to undertake an investigation, the jury could infer that the employer was complicit").

---

[14] The timeframe between Plaintiffs' reports against Crowley and the start of Sjosward's alleged retaliation is even shorter, with Plaintiffs first reporting Crowley around November or December 2014. (D.E. 113 ¶¶ 46-49, 87-90.)

13

Giving Plaintiffs all favorable inferences, they sufficiently plead a causal connection, and "should be afforded the opportunity to develop proof of causation through discovery." *See Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018).

### ii. Count 7: Retaliation Under NJLAD

To establish retaliation under the NJLAD, Plaintiffs must show: (1) that she engaged in "protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Tinio v. Saint Joseph Reg'l Med. Ctr.*, 645 F. App'x 173, 176 (3d Cir. 2016) (internal quotation marks omitted). The parties agree the standards for Plaintiffs' NJLAD and CEPA claims are substantively similar. (*See* D.E. 116-1 at 34; D.E. 123 at 34 n. 7.) *See also Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 964 (1994). For the same reasons Plaintiffs' CEPA claims survive, their NJLAD claims survive.

### iii. Count 4: Conspiracy

Conspiracy under New Jersey law is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2005) (internal citations and quotation marks omitted).

Plaintiffs sufficiently plead conspiracy against Sjosward. Plaintiffs plead that, when allegedly retaliating, Sjosward acted "with the assistance and encouragement of Zacche and Shea," who were also involved with IA. (D.E. 113 ¶ 106; *see also id.* ¶¶ 102-03, 107-09.) Defendants primarily contend that there was no conspiracy because the Pulaski Investigation was proper (*see*

D.E. 116-1 at 35) however, as discussed above, at this stage, Plaintiffs have sufficiently pled that the investigation was not proper.[15]

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED**. An appropriate Order follows.

s/ *Susan D. Wigenton*_____
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk
cc:     Edward S. Kiel, U.S.M.J.
        Parties

---

[15] Defendants also argue in their reply that Plaintiffs fail to plead an agreement between Sjosward and the other Defendants. (D.E. 127 at 11-12.) This Court finds agreement may reasonably be inferred from Plaintiffs' allegations that Sjosward acted with Zacche and Shea's "assistance" while they were working together at IA to "falsely implicate Plaintiffs by providing false documents." (D.E. 113 ¶¶ 106-116.) *See also Shan Indus., LLC v. Tyco Int'l (US), Inc.*, Civ. No. 04-1018, 2005 WL 8156842, at *10 (D.N.J. Sept. 12, 2005) (noting "the question of whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer [agreement] from the circumstances" (internal citations and quotation marks omitted)).